RECEIVED
USDC, WESTERN DISTRICT OF LA.
TONY R. MOORE, CLERK
DATE 6/6/09
BY CL

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **JAMES R. PIPES** | **CIVIL ACTION NO. 3:07-CV-1762** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **UNITED PARCEL SERVICE, INC.** | **MAG. JUDGE KAREN L. HAYES** |
| **and INTERNATIONAL** | |
| **BROTHERHOOD OF TEAMSTERS** | |

## RULING

Plaintiff James R. Pipes ("Pipes") brought this action against his former employer, United

Parcel Service, Inc. ("UPS"), alleging that he was terminated in retaliation for filing a workers'

compensation claim and that his termination was also a breach of the collective bargaining

agreement between UPS and Local 568, an affiliate of the International Brotherhood of

Teamsters ("the International"). Pipes also asserted a claim against the International for breach

of the duty of fair representation in grievance proceedings that followed his termination.

On February 27, 2009, the International filed a Motion for Summary Judgment [Doc. No.

34], seeking dismissal of the claim against it. On March 2, 2009, UPS also filed a Motion for

Summary Judgment [Doc. No. 37], seeking dismissal of all claims against it.

Pipes filed a memorandum in opposition to the Motions for Summary Judgment [Doc.

No. 81].[1] Pipes also filed a Motion to Strike [Doc. No. 70] portions of the affidavit of Jerry

Gordanier, submitted by UPS with its Reply [Doc. No. 61] in support of its Motion for Summary

---

[1]Although the memorandum is styled, "Memorandum on Behalf of the Plaintiff, James R.
Pipes, in Opposition to Motion for Summary Judgment Filed by the United Parcel Service,"
Pipes addresses the arguments of both UPS and the International.

Judgment. UPS filed a memorandum in opposition to the Motion to Strike [Doc. No. 75]. Pipes filed a reply memorandum in support of his Motion to Strike [Doc. No. 85].

For the following reasons, the International's and UPS's Motions for Summary Judgment are GRANTED. Pipes's Motion to Strike is DENIED IN PART and the remainder of his motion is DENIED AS MOOT.

## I. FACTS

In October 1999, UPS hired Pipes as a temporary employee during peak season to unload trucks and to work as a driver's helper. After peak season, UPS continued to employ Pipes part time performing pre-load, local sort, and clerical work and some driving for the Ruston UPS center. In June 2004, UPS hired Pipes full time as a swing driver[2] in the Ruston center, and he worked in that capacity until his termination in April 2007. Throughout his employment, Pipes was a member of Local 568 of the International.

UPS and Local 568 had entered into two agreements, the National Master United Parcel Service Agreement and Southern Region Supplemental Agreement (collectively the "CBA"), which governed the relationship between UPS and the bargaining unit employees.[3] The CBA set

_____

[2]Swing drivers do not have their own assigned package routes, but are hired to fill in for drivers with assigned routes.

[3]The National Master United Parcel Service Agreement ("National Master") and the Southern Region of Teamsters and United Parcel Service, Inc. Supplemental Agreement ("Southern Region Supplement") are actually two separate documents. The National Master applies to all UPS union employees nationwide. The Southern Region Supplement applies only to UPS union employees in the Southern Region or Conference. The two agreements were negotiated separately and have separate provisions for grievance and arbitration procedures. The documents are signed by UPS, the "Teamsters United Parcel Service National Negotiating Committee representing Local Unions affiliated with the [International]," and the Local Union. Defendant International is not a signatory.

2

forth the rights and remedies for work-related complaints of bargaining unit employees.

UPS drivers were required to have a clean driving record, have a chauffeur's license, and pass a DOT physical (every two years), a driving course, and an annual road test. UPS drivers also receive Space and Visibility training at least annually. UPS emphasizes to its drivers the necessity for them to follow the specific driving techniques taught in its training courses, known as the "Five Seeing Habits," and places stickers in its package cars to remind drivers of these defensive driving habits.

Prior to April 2007, Pipes caused three accidents while driving for UPS, all resulting in property damage.

On April 16, 2007, Pipes was driving a UPS package car. Prior to taking the car out, Pipes conducted his daily pre-trip inspection, known as "pretripping" the car, including an inspection of the tires. If he had noted any problems or repairs that needed to be made, he would have made a notation on the Driver Vehicle Inspection Report ("DVIR") tablet located in the car. UPS mechanics routinely check the DVIR tablet to see what repairs need to be made and perform those repairs, or take the car out of service.

On the day of April 16, 2007, the weather conditions were dry and clear, and Pipes was traveling on a rural road in Homer, Louisiana. While going around a curve and up a hill, Pipes heard a "pop" come from the package car. Pipes contends that his front passenger wheel immediately pulled off the road to the right. Pipes quickly steered the package car back onto the road to avoid hitting the line of trees in front of him, but then lost control of the car. The back end of the car came around, causing him to turn more than 180 degrees counter-clockwise. As the back end began leading the package car, Pipes crossed the road at a 45-degree angle, hit the

embankment on the other shoulder with his back end, and then rolled completely over once, counter-clockwise, and landed upright. Pipes could not recall if a speed limit was posted on the road, and he did not know for certain how fast he was going.

After the accident, Pipes contacted the Business Agent for Local 568, Doug Beckham ("Beckham")[4], and Clay Burrough ("Burrough"), the UPS Division Manager for a number of centers in north Louisiana, including Ruston. They inquired if Pipes was okay and if he needed an ambulance. The police were called and interviewed Pipes, but did not issue a citation. Burrough, who has 22 years of investigative experience with UPS; Pipes's supervisor, Ronald McCown ("McCown"); Al Delaune ("Delaune"), UPS Gulf South Health and Safety Supervisor; and Gerald Castille ("Castille"), UPS Automotive Supervisor, all traveled to the accident scene to check on Pipes and conduct an investigation. Pipes told Burrough at the scene that the right, front tire of the package car blew out, causing Pipes to go off the road. As a result of the accident, the package car was severely damaged. The gear shift dislodged from the car completely, broke off, and landed on the ground, and the windshield came completely out.

Pipes left the accident scene with McCown and returned to the Ruston UPS center where they contacted UPS's insurance carrier to report the accident. McCown insisted that Pipes contact him after receiving medical treatment. Pipes went home and then went to the emergency room, where Pipes's wife was working as a nurse. Pipes underwent CAT scans and X-rays and was given fluids and pain medication. Pipes suffered minor injuries in the form of cuts, bruises, and scrapes as a result of the accident. He followed up with a physician two to three times after the

---

[4]Beckham's full-time job is to represent the interests of bargaining unit employees and act as the liaison between union employees and UPS management to resolve grievances.

accident. Pipes was off from work for approximately three weeks until he was cleared to return to full duty.

Although Pipes told Burrough that a blown tire had caused the accident, based on the skid marks and the placement of the package car, Burrough, Delaune, and Castille believed that Pipes had been traveling too fast around the turn and had caused the accident by overcorrecting. UPS towed the package car to Shreveport for a mechanical inspection. Union mechanics Joffery Cleveland and Glen Davis conducted the inspection under Castille's supervision and found no mechanical problems. Castille also sent the right front tire to Southern Tire Mart, an unrelated company, for inspection. According to Southern Tire Mart, the right, front tire held pressure at 77 psi, did not leak down, was not run flat, and no defects were found in its casing or cap. Photographs of the tire at the scene showed that mud was lodged between the tire and the rim at the point of the seal.

Based on this evidence, Castille came to the conclusion that the tire deflated when it became separated from the rim during the accident, not before the accident. UPS found no evidence that the accident was caused by the tire blowing out or deflating or any other mechanical failure. Pipes disputes Castille's conclusions and was not present for the inspections by UPS or Southern Tire Mart, but he has no reason to believe that the reports are untruthful.

When Burrough received the mechanical inspection report and report from Southern Tire Mart, he concluded that Pipes had lied about the cause of the accident. Burrough sent the accident scene photographs and the reports to UPS Gulf South District Labor Manager Rob Russell ("Russell"). Burrough and Russell made the decision to terminate Pipes for just cause,

pursuant to Article 52 of the CBA for "recklessness resulting in a serious accident."[5]

On April 25, 2007, McCown, union steward Bruce Rushing, and UPS Business Manager Reginald Wells met with Pipes at the Ruston center. They informed him that he was discharged. After the meeting, Pipes had no other communications with UPS about his termination.

Pipes filed a grievance challenging his termination. Article 51 of the CBA sets forth the grievance procedure and requires that a grievance proceed through three steps before reaching arbitration: a local hearing, a panel hearing before the Southern Region Area Parcel Grievance Committee ("SRAPGC"), and a panel hearing before a SRAPGC Deadlock Panel ("Deadlock Panel"). The SRAPGC is a committee composed of three UPS representatives and three union representatives. If the SRAPGC does not reach a majority decision on the grievance, the grievance advances to the Deadlock Panel, composed of one UPS representative and one union representative.[6] Cases that are deadlocked at the Deadlock Panel may be referred to binding arbitration before a Federal Mediation and Conciliation Service arbitrator. The CBA expressly provides that decisions at each level of the grievance procedure are "final and binding."

---

[5]Article 52 reads in relevant part as follows:

Article 52 - Discharge or Suspension

(A) The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one (1) warning notice of a complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, except that no warning notice need be given to an employee before discharge if the cause of such discharge is dishonesty, . . . recklessness resulting in a serious accident while on duty, an avoidable runaway accident . . . .

(Pipes Exh. 8, p. 188-89).

[6]The union representatives on the SRAPGC and Deadlock Panel are representatives from other International local unions (i.e., local unions of which the grievant is not a member).

6

Pursuant to the CBA, a local hearing was held at the Shreveport center in an attempt to resolve Pipes's grievance. Beckham represented Pipes at the hearing. Those in attendance inspected the package car, and UPS personnel informed Pipes of the results of the mechanical inspection of the vehicle. The grievance was not resolved at the local hearing and, thus, moved to the next step, a hearing by the SRAPGC.

On May 15, 2007, the grievance was formally heard in Tampa before the SRAPGC. Beckham again represented Pipes at the panel hearing. Russell represented UPS. The SRAPGC heard arguments from both sides, and Pipes made a statement. However, the SRAPGC deadlocked, and the grievance automatically proceeded to the next stage of review before the Deadlock Panel.

On August 16, 2007, the grievance was heard by a Deadlock Panel of two neutral decision makers, Jerry Gordanier ("Gordanier") for UPS and Clay Jeffries ("Jeffries") for the International. Gordanier is a Region Labor Manager for UPS, and Jeffries is a Business Agent for Local 385 out of Orlando, Florida. Although Pipes did not attend the Deadlock Panel hearing, Beckham delivered an opening statement and read Pipes's written statement. Beckham argued that Pipes's discharge violated Article 18 of the CBA because the accident did not meet the definition of "serious accident" in Article 18. Russell represented UPS and argued that Pipes's recklessness caused the serious accident, which justified his termination under Article 52.14. The Deadlock Panel voted to sustain Pipes's termination on the basis that the accident was serious and that it was caused by Pipes's recklessness.

On October 25, 2007, Pipes filed this lawsuit against UPS and the International.

## II. LAW AND ANALYSIS

### A.     Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B.     Hybrid Section 301 and Duty of Fair Representation Claims

Section 301 of the Labor-Management Relations Act ("LMRA") provides an employee with a federal cause of action against his employer for breach of a collective bargaining agreement. 29 U.S.C. § 185; *see also Smith v. Evening News Ass'n*, 371 U.S. 195 (1962). Employees also have an implied cause of action against the union which represents them if the union breaches its duty of fair representation.[7] *See Vaca v. Sipes*, 386 U.S. 171 (1967); *see also Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 563 (1990) ("The

---

[7]Within the meaning of 29 U.S.C. § 185, it is undisputed that UPS is an "employer" and that both Local 568 and the International are "labor organization[s]." 29 U.S.C. § 185

duty of fair representation is inferred from unions' exclusive authority under the National Labor Relations Act . . ., 29 U.S.C. § 159(a) (1982 ed.), to represent all employees in a bargaining unit."). The Supreme Court has stated that these two claims are "inextricably interdependent." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983).

> The interdependency arises from the nature of the collective bargaining agreement. If the arbitration and grievance procedure is the exclusive and final remedy for breach of the collective bargaining agreement, the employee may not sue his employer under § 301 until he has exhausted the procedure. Further he is bound by the procedure's result unless he proves the union breached its duty of fair representation.

*Daigle v. Gulf State Utility Co.*, 794 F.2d 974, 977 (5th Cir. 1986). Thus, "[t]o prevail against either the company or the Union, . . . [the employee] must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *DelCostello*, 462 U.S. at 164-65; *see also Brown v. Witco Corp.*, 340 F.3d 209, 213 n.5 (5th Cir. 2003).

The trial court engages in a two-step analysis to evaluate these so-called hybrid Section 301/fair representation claims. Because the union's breach of its duty of fair representation is an "indispensable predicate" to recovery against the employer, the court should first determine whether there is sufficient evidence to support the claim against the union. *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846, 851 (5th Cir. 1989) (citations omitted). If so, the court then reviews the Section 301 claim to determine whether the employee has proved that the employer discharged him in violation of the collective bargaining agreement. *See id.* Accordingly, this Court will first address Pipes's claim against the International.

### 1. Pipes's Section 301 Claim Against the International

Pipes asserts a claim against the International for breach of the duty of fair representation.

9

A union has a statutory duty to represent fairly all bargaining unit employees in the enforcement of the collective bargaining agreement. *Vaca*, 386 U.S. at 177. However, an employee has no "absolute right" to have his grievance taken to arbitration or to a specific level of the grievance process. *Landry*, 880 F.2d at 852. The mere fact that a union fails to pursue arbitration is insufficient as a matter of law to demonstrate a breach of its duty of fair representation. *See Vaca*, 386 U.S. at 192. Rather, a union has "an obligation to prosecute a grievance 'with reasonable diligence unless it is decided in good faith that the grievance lacked merit or for some other reason should not be pursued.'" *Landry*, 880 F.2d at 852 (quoting *Hammons v. Adams*, 783 F.2d 597, 602 (5th Cir. 1986)). Neither "simple negligence [nor] a mistake in judgment" is a breach of the union's statutory duty; the "critical question" is whether the union's actions were "arbitrary, discriminatory or in bad faith." *Id.; see also Vaca*, 386 U.S. at 190.

In this case, the CBA identified Local 568 and the National Negotiating Committee as the exclusive bargaining representatives under the CBA, not the International. The United States Supreme Court has recognized that common law principles of agency govern whether an international union is liable for the actions of a local affiliate. *See Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216-17 (1979) (applying the common law principles to determine whether an international union was liable for an unauthorized strike by one of its locals). Thus, an international union is not "vicariously liable for the acts of the local union or its business agent" merely on the basis of their relationship. *See Hammons v. Adams*, 783 F.2d 597, 604, 604 n.29 (5th Cir. 1986) (citing, in dicta, *Shimman v. Frank*, 625 F.2d 80, 97 (6th Cir.1980)); *see also Shinman*, 625 F.3d at 97 ("The International Union is a separate body from

the local. The acts of the local and its agents cannot automatically be imputed to the International."); *Mosley v. Roadway Exp. Inc.*, Civil Action No. H-07-1406, 2009 WL 1064182, at *8 n.5 (S.D. Tex., Apr. 17, 2009) (where plaintiff conceded that the Local, not the International Union, was his exclusive bargaining agent, his claim against the International Union was dismissed).

In this case, Pipes's sole complaint against the International is that the union member of the Deadlock Panel, Clay Jeffries, voted to uphold his termination.

First, the Court finds that it is doubtful that the International owed Pipes a duty of fair representation in the grievance process. The International was not a signatory to the CBA. *See Teamsters Local Union No. 30 v. Helms Express, Inc.*, 591 F.2d 211, 217 (3d Cir. 1979); *Sine v. Local No. 992, Int'l Bhd. of Teamsters*, 730 F.2d 964 (4th Cir. 1984). In addition, the International had not assumed the role of bargaining unit representative, was not the administrator of the CBA, and had not undertaken Pipes's representation in the grievance process

However, the Court recognizes at least one appellate court has also found that "the duty of fair representation [is] a flexible duty, varying as the union function varies," and thus, "the union owes its members a duty of fair representation while serving in each of its many roles," including a duty of fair representation while serving as a member of a joint grievance committee.[8] *See Thomas v. UPS*, 890 F.2d 909, 922 (7th Cir. 1989). Nevertheless, even in *Thomas,* the Seventh Circuit recognized that the "nature of the union's role in sitting on a [joint grievance

---

[8]The Court is also aware that the International's Rule 30(b)(6) representative, Kenneth Wood, testified that the International owed a duty of fair representation to Pipes. Wood's opinion on a legal conclusion does not create a genuine issue of material fact for trial. Nevertheless, for the reasons discussed, *infra*, Pipes cannot meet his burden even if he was owed a duty of fair representation by the International.

11

committee] is essentially that of an arbitrator and the union fulfills its duty of fair representation by rendering a fair and impartial decision on the merits." *Id.* In that regard, a union member of a joint grievance committee cannot " rely upon political, religious, racial, ethnic, personal, or otherwise impermissible factors when ruling upon a grievance petition." *Id.*; *see also Olsen v. United Parcel Service*, 892 F.2d 1290, 1297 (7th Cir. 1990) ("[W]e have held that fair representation in the JGC context is met by the fair and impartial consideration of grievances without regard to 'political, religious, racial, ethnic, personal, or otherwise impermissible factors. . . .'") (citing *Thomas*, 890 F.2d at 922)).

The Court need not determine today whether the International owed Pipes a duty of fair representation because its appointees served on the SRAPGC and/or the Deadlock Panel.[9] Even if Pipes was owed a duty by the International, there are no genuine issues of material fact for trial. Pipes has admitted that his grievance was filed, was taken through the proper steps, and that he was satisfied with the representation of Local 568's Business Agent, Beckham, at the local and panel hearings. There was no majority decision reached at the SRAPGC, and the case advanced to the Deadlock Panel. Although he was not present at the Deadlock Panel, he had no reason to believe that Beckham had not represented him well there, too. The role of the International appointee to the Deadlock Panel, Jeffries, was not to advocate for Pipes, but to render, along with his UPS counterpart, a neutral decision. Pipes has produced no evidence that Jeffries or any other representative of the International acted arbitrarily, capriciously, or

---

[9]Likewise, the Court need not reach Pipes's argument that the International owed a duty of fair representation to him because the "Teamsters United Parcel Service National Negotiating Committee" participated in the negotiation of the CBA, was a signatory to the CBA, and was identified as an exclusive bargaining agent, along with Local 568. [Doc. No. 81, p.11].

discriminatorily. Jeffries has provided affidavit testimony that he voted to sustain the grievance and uphold Pipes's termination "solely on [his] independent voluntary judgment of the merits of the grievance based on the hearing evidence and the applicable contract language." [Doc. No. 34, Jeffries Aff., ¶8]. While Pipes is understandably dissatisfied with the result of the grievance process and that he was not permitted to proceed to arbitration, his personal dissatisfaction is insufficient to raise a genuine issue of material fact for trial. Thus, the International's Motion for Summary Judgment on Pipes's Section 301 claim is GRANTED, and the claim is DISMISSED WITH PREJUDICE.

### 2. Pipes's Section 301 Claim against UPS

Pipes cannot establish his remaining Section 301 claim against UPS for breach of the CBA without also having established that the International breached its duty of fair representation. Having found no genuine issue of material fact to support Pipes's claim against the International, the Court must also dismiss the Section 301 claim against UPS. UPS's Motions for Summary Judgment on Pipes's Section 301 claim is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### C. Workers' Compensation Retaliation

Pipes also asserted a workers' compensation retaliation claim against UPS under Louisiana Revised Statute Section 23:1361(B).

Section 23:1361(B) provides: "No person shall discharge an employee from employment because of said employee having asserted claims for benefits under the provisions of this chapter or under the laws of any state or the United States." In advancing a claim for retaliatory discharge under the Workers' Compensation Statute, the employee bears the burden of proving

13

by a preponderance of the evidence that he was terminated for asserting a workers' compensation claim. *Lewis v. Willamette Indus., Inc.*, 537 So. 2d 780 (La. App. 2d Cir. 1989). In a case where "the employer offers another justification in connection with firing a workers' compensation claimant, the trial court must ascertain the employer's true reason or motive based on the facts presented. An employer cannot circumvent the statute by stretching the facts out of context or inventing an excuse for firing a compensation claimant." *Id.* at 783.

"Timing of the dismissal alone is insufficient to carry the employee's burden of proof." *Woolsey v. Delta Disposals, L.L.C.*, 40,339 (La. App. 2 Cir. 10/26/05); 914 So.2d 618, 621 (citing *King v. Career Training Specialists, Inc.*, 35,050 (La. App. 2 Cir. 9/26/01); 795 So.2d 1223, 1228). Rather, timing may be some evidence of retaliatory motive when presented with additional evidence. *See King*, 795 So.2d at 1228. Even so, "[e]mployee fault may be a sufficient independent basis for termination coincident with the employee's filing of a compensation claim. *Woolsey*, 914 So.2d at 622 (citing *Myers v. Omni Hotel, Inc.*, 94-2004 (La. App. 4 Cir. 4/13/95); 654 So.2d 771).

In this case, Pipes's only evidence to support his claim of workers' compensation retaliation is timing. He has no other direct or circumstantial evidence to support his claim. UPS, on the other hand, has presented evidence that he was terminated for having a serious accident while driving a UPS package car. While Pipes may disagree whether the reason for his termination is adequate under the CBA's language, he has presented no evidence that the reason was pretext for workers' compensation retaliation. Accordingly, UPS's Motion for Summary Judgment on this claim is also GRANTED.

### D. Motion to Strike

Pipes also moved the Court to strike portions of the declaration of Jerry Gordanier. [Doc.

14

No. 70]. To the extent that Pipes objected that Gordanier's statements in paragraph 3 of his declaration constituted "legal conclusions," the Court disagrees and finds that Gordanier could properly testify as to the factual nature of his role on the Deadlock Panel. Pipes's Motion to Strike is DENIED IN PART.

The remainder of Pipes's motion addresses Gordanier's interpretation of the CBA. Given the Court's conclusions in this matter, it has not considered these statements, and, thus, the remaining portion of Pipes's Motion to Strike is DENIED AS MOOT.

## III.    CONCLUSION

For the foregoing reasons, Defendant International's Motion for Summary Judgment [Doc. No. 34] and Defendant UPS's Motion for Summary Judgment [Doc. No. 37] are GRANTED. Accordingly, Pipes's claims against all Defendants are DISMISSED WITH PREJUDICE.

Pipes's Motion to Strike [Doc. No. 70] is DENIED IN PART as to Gordanier's statements regarding his role on the Deadlock Panel. The remainder of the motion is DENIED AS MOOT.

MONROE, LOUISIANA, this ___16___ day of ___June___, 2009.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

15